MAID–RITE STEAK COMPANY, INC.
and Donald Bernstein and Elaine
Bernstein, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. No. 83–0660.

United States District Court,
Middle Dist. Pa., Third Circuit Div.

March 28, 1986.

Morey M. Myers, Gelb, Myers, Bishop &
Warren, Thomas I. Vanaskie, Scranton,
Pa., for plaintiffs.

Barbara Kosik, Asst. U.S. Atty., U.S.
Atty.'s Office, Scranton, Pa., Stephen Carl-
ton, Trial Atty., Tax Div., U.S. Dept. of
Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Plaintiffs filed this action pursuant to 28
U.S.C. § 1346 on May 17, 1983 for recovery
of income taxes erroneously assessed and
collected. The precise issue presented is
whether the plaintiff-taxpayers, having er-
roneously claimed an investment tax credit
as non-corporate lessors may "pass-
through" that tax credit to their corpora-
tion-lessee. On April 12, 1985 the defend-
ant filed a Motion for Summary Judgment
and Motion to Strike Names from the Cap-
tion along with a brief in support thereof.
The plaintiffs filed a brief in opposition to

the defendant's motion on May 17, 1985 and their own Motion for Summary Judgment and brief in support thereof on May 21, 1985. On June 21, 1985, the Government filed a reply brief and brief in opposition to plaintiffs' cross motion for summary judgment. The plaintiffs, thereafter, filed their reply brief dated July 10, 1985. Oral argument on the motions was heard September 6, 1985. The motions for summary judgment are now ripe for disposition. For the reasons set forth below, the Government's motion for summary judgment will be denied and the plaintiffs' cross motion for summary judgment will be held in abeyance pending submission of supplemental briefs.

## I. FACTS

Maid-Rite Steak Company, Inc. (Maid-Rite), a Pennsylvania corporation, is engaged in the business of producing and processing frozen portion-controlled meat products. Donald Bernstein is the President and principal shareholder of Maid-Rite, owning 70% of its outstanding shares.

In 1978, Donald and Elaine Bernstein, in order to relocate Maid-Rite's plant, entered into an Installment Sales Agreement with the Lackawanna County Industrial Development Authority for the acquisition and improvement of a facility in the Keystone Industrial Park, Dunmore, Pennsylvania. Included among the improvements made to the facility was the installation of an ammonia refrigeration system. By lease agreement dated January 13, 1978, as amended on October 1, 1978, the Bernsteins leased the facility, together with the ammonia refrigeration system, to Maid-Rite. The lease agreement was for a term of twenty-one years [1] and was executed by Donald Bernstein as lessor and as President of Maid-Rite as lessee.

In 1979 and 1980, the Bernsteins claimed an investment tax credit on their joint income tax returns for the refrigeration system leased to Maid-Rite. The total cost of

the system was $1,398,896.00. The Bernsteins relied upon William E. Acornley, a Certified Public Accountant, who advised them that, as owners, they were entitled to claim the investment tax credit. In fact, they were not entitled to claim this credit as non-corporate lessors under 26 U.S.C. § 46(a)(3)(B), Internal Revenue Code of 1954 and Treasury Regulations, 26 C.F.R. § 1.46–4(d) because the lease was for twenty-one years on a property with a useful life of twelve years. Eligibility for non-corporate lessors under the statute requires that the lease term be less than 50% of the property's claimed useful life.

In the fall of 1981, a tax examination of the Bernsteins' and Maid-Rite's tax returns by Agent Richard Whiteford of the Internal Revenue Service disclosed that the Bernsteins were not entitled to the investment tax credit because they did not meet the requirements of the aforementioned test for non-corporate lessors. Subsequently, Mr. Acornley requested that the Bernsteins be allowed to pass through the investment tax credit of $139,890.00 to Maid-Rite. The request was denied on the ground that the pass-through election had not been made before the deadline established by Treas.Reg. § 1.48–4(f)(2). The Bernsteins, on March 23, 1982, applied to the Internal Revenue Service for an extension of time in which to file a pass-through election. In this letter, the Bernsteins stated that while they had previously claimed the tax credit on their individual returns for 1979 and 1980, they had relied on their accountant's advice and were totally unaware of their ineligibility. In addition, on or about May 25, 1982, approximately one year after the due date for filing its corporate tax return, Maid-Rite filed an amended 1980 corporate income tax return claiming the disallowed investment tax credit. The Bernsteins were subsequently advised by letter that their request for an extension of time to pass through the investment tax credit to Maid-Rite had been denied and

---

**1.** It was required by the Lackawanna County Industrial Development Authority that a lease be a minimum of 21 years in length.

that Maid-Rite's claim for a refund, based on a pass-through of the credit, had also been disallowed. Thereafter, plaintiffs paid the full amount assessed and filed this refund action.

## II. STATUTORY FRAMEWORK

Section 38 of the Internal Revenue Code of 1966, as amended in 1971, provides: "There shall be allowed, as a credit against tax imposed, the amount determined under" sections 46 through 48 of the Code. 26 U.S.C. § 38(a). To carry out the purpose of § 38, the Secretary is authorized to prescribe such regulations as are necessary. 26 U.S.C. § 38(b). Sections 46–48 provide rules to be utilized in computing credit for investment in § 38 depreciable property and define those investments which qualify for the investment credit. Specifically, § 46(e)(3) provides, with respect to non-corporate lessors, that a credit shall be allowed for § 38 property only if, *inter alia,* the term of the lease is less than 50% of the useful life of the property. Further, § 48(d)(1) allows the parties to a lease of new § 38 property to treat the lessee as having acquired the property so that the lessee then may claim the investment tax credit.

The Treasury Department has promulgated a number of regulations pursuant to § 48. Treasury Regulation § 1.48–4(f)(1) states that if the lessor elects to pass through the investment tax credit to the lessee, the election shall be made by filing a statement with the lessee, signed by the lessor and including the written consent of the lessee, containing certain specified information. Pursuant to Treas.Reg. 1.48–4(f)(2), the statement shall be filed with the lessee on or before the due date of the lessee's return for the lessee's taxable year during which possession of the property is transferred. Additionally, the parties are required to keep a copy of the statement for their records and a statement must be attached to the lessor's federal income tax return summarizing all property leased during the lessor's taxable year with respect to which an election is made. *See*

*e.g.,* Treas.Reg. 1.48–4(j). Further, the regulations provide that an election made pursuant to § 48 shall be irrevocable as of the time the statement is filed with the lessee. Treas.Reg. 1.48–4(f)(3). Finally, pursuant to Treasury Regulation § 1.9100–1, the Commissioner has discretionary authority to grant extensions of time. The discretionary authority under § 1.9100–1 is applicable to extensions of time in which to file an election to pass through an investment credit. Revenue Ruling 79–415; *See infra* at 16.

The legislative history surrounding passage of the investment tax credit reveals that Congress intended to stimulate economic growth by providing an incentive to initiate capital investment projects. *See Comdisco, Inc. v. United States,* 756 F.2d 569, 572 (7th Cir.1985). In *Comdisco,* the court examined extensively the legislative history behind the tax credit. "It is believed that the investment credit ... will provide a strong and lasting stimulus to a high rate of economic growth and will provide an incentive to invest comparable to those available elsewhere in the rapidly growing industrial nations of the free world." *Comdisco, supra* at 572 (citing H.R.Rep. No. 1477, 87th Cong. 2d Sess. (1962)). In discussing the election provided for under § 48(d), the House Report stated that such a provision was "desirable since, as a result of [the election], it is possible for the lessor to pass the benefit of the investment credit on to the party actually generating the demand for the investment." *Comdisco, supra* at 572 (citing H.R.Rep. No. 1477, 87th Cong. 2d Sess. (1962)).

As the *Comdisco* court noted, the Senate Report reflected a similar ideology: "The objective of the investment credit is to encourage modernization and expansion of the nation's productive facilities and thereby improve the economic potential of the country, with a betterment in our competitive position in the world economy." *Comdisco, supra* at 572 (citing S.Rep. No. 1881, 87th Cong., 2d Sess. (1962), U.S. Code Cong. & Admin. News, 1967, p. 3297).

The enactment of the investment tax credit provision and allowance for the pass-through election was not without concern. The Senate reports accompanying the enactment of this section also explain:

The Committee is concerned, however, as was the House, that the restoration of the credit could once again make leasing arrangements motivated largely by tax reasons quite attractive. The committee agrees with the House that it is appropriate to impose limitations on the availability credit to individual lessors [and non-corporate lessors].

The bill provides that the credit is to be available to an individual [or other non-corporate] lessor in only two situations ... In these situations, the lease arrangement is an integral part of the taxpayer's business and is not likely to have been entered into for the purpose of reducing tax liabilities.

[Additionally,] the bill provides, in general for the allowance of the credit in the case of short-term leases since in these cases the leasing activity constitutes a business activity of the taxpayer, rather than a mere investment, *i.e.*, a financing arrangement.

S.Rep. No. 92–437, 92d Cong. 1st Sess. at 43–44, U.S. Code Cong. & Admin. News 1971, pp. 1825, 1950–1951 (1972–1 Cum. Bull. 559, 583).

Thus, while enactment of the credit was motivated by concerns regarding the depressed state of the economy, the credit was limited as to non-corporate lessors so that individuals would utilize the tax credit in business activities rather than enter into such lease arrangements only for the purpose of reducing tax liabilities.

### III. DISCUSSION

■ Having set forth the relevant statutory framework, the court turns to the issues raised by the parties. For the purposes of this summary judgment motion only, neither party questions the amount of the claim, nor that the ammonia refrigeration system is properly classified as § 38 property. Further, it is undisputed that Maid-Rite, as a lessee, would have been able to claim the investment tax credit. Rather, the dispute centers around the Bernsteins having claimed the credit for themselves personally and when having been informed that they did not qualify under the regulations, the defendant's refusal to allow the Bernsteins to pass through the tax credit to Maid-Rite.

In support of their action, the Bernsteins advance three major arguments. First, they contend they may revoke their "election" to claim the tax credit personally because it was an impermissible choice. The Bernsteins maintain that it is only when the original election is a permissible one can it be held to be irrevocable. In other words, they argue that before a taxpayer's election can be held to be binding upon him, he must have two legal and allowable alternatives from which to choose. Inasmuch as the Bernsteins did not qualify as non-corporate lessors (because the lease term was more than 50% of the useful life of the property), the only choice available was to pass through the credit to Maid-Rite. According to plaintiffs, then, there was no election made and Maid-Rite, the lessee, should be free now to file an amended return claiming the tax credit. Secondly, the Bernsteins argue that compliance with Treasury Regulation § 1.9100–1 specifically allows for extensions of time fixed by the regulations. Thus, § 1.9100–1 grants the Commissioner discretionary authority to permit an extension of time for making the election to pass through the investment tax credit to the lessee. Finally, plaintiffs contend that they met the good cause requirements under § 1.9100–1 and, therefore, the Commissioner's denial of plaintiffs' extension request was an abuse of discretion.

The Government, of course, is of an opposite view. It maintains that the Bernsteins' decision to claim the investment tax credit was a binding election and, further, that because Treasury Regulation § 1.48–4 is a legislative regulation, it has the force and effect of law. Therefore, mandatory compliance with the provision for filing a

timely pass-through election is required. Finally, the defendant contends there was no abuse of discretion in refusing to grant an extension of time under Treas.Reg. § 1.9100–1 because plaintiffs failed to establish good cause.

### A. The Revocability of the Bernstein's "Election"

In support of their argument that they should be able to amend their personal claim of the tax credit, plaintiffs rely principally on *Mamula v. Commissioner,* 346 F.2d 1016 (9th Cir.1965) decided by the Ninth Circuit Court of Appeals. In *Mamula,* the plaintiff-taxpayer improperly reported a sale of realty on the deferred payment method. In holding that the taxpayer could amend his tax return, the court stated:

> The present case does not involve an election by a taxpayer to which he is conclusively bound. Indeed, the taxpayer could not be bound by his election for it was a nonallowable choice—it was not allowable and not allowed. No one was bound. We are not here concerned with a taxpayer who uses hindsight to learn that the method he had chosen, though proper, was not the most advantageous to him. We are rather concerned with an instance where the method chosen by the taxpayer is advanced in good faith, and later conceded to have been improper.... The taxpayer has not been accused of any fraudulent activities nor any criminal violations; he rather has been found to have adopted, in good faith, an incorrect method of income recognition. *No forfeiture or penalty is assessed by law for such a mistake.*

> .    .    .    .    .

In light of the unique retroactive election of the installment method so as to be used in this case where there has been good faith and a full disclosure of the transactions in the year of sale, it seems inequitable and unfair that the Regulations should be applied literally, contrary to the purpose and in conflict with the intent originally expressed by the Congress in passing the remedial statute. *Id.* at 1018–20 (emphasis in original). The Bernsteins argue that because their decision to claim the tax investment credit was a nonallowable choice, they cannot be bound. Further, they maintain that *Mamula* is an analogous situation to the case *sub judice* because here, as the Government conceded, plaintiffs also were acting in good faith.[2] *See* Plaintiff's Statement of Undisputed Facts, Document 31 of the Record at ¶ 27. A result similar to that reached in *Mamula* was found in *Silver Queen Motel v. Commissioner,* 55 T.C. 1101 (1971). In *Silver Queen,* the taxpayer first elected the double-declining balance method of computing depreciation. Later, conceding that such a method was not available to him, the taxpayer sought to adopt the 150%–declining balance method instead. In allowing the taxpayer to amend, the court noted that the situation differed "from those cases where the taxpayer has, of his own volition, adopted an acceptable method of computing depreciation and has sought thereafter to change from the acceptable method originally used to another acceptable method which he finds more favorable." *Silver Queen, supra* at 1105 (citations omitted).

In a much earlier case, *LeBolt & Co. v. United States,* 67 Ct.Cl. 422 (1929), the Court of Claims attempted to distinguish between allowable and nonallowable methods of making a return:

> The weight of authority is to the effect that where there are two methods of making an income-tax return, either one of which is legal and proper and the taxpayer has made his return in accordance with one of these methods, then, if the return is accepted and taxes paid accordingly, the taxpayer cannot subsequently change to the other method of making a return and thereby become entitled to a refund. But if there is only one legal and proper method of making a

2. The Government maintained, however, in oral argument before this court that the plaintiff's good faith, while conceded, was irrelevant to this case.

return and the taxpayer erroneously makes his return by some other method, then, even if the return has been accepted and the taxes paid, he may file an amended return correcting the error, and if this return shows an overpayment, he becomes entitled to a refund.

*Id.* at 426. *Lebolt* involved a taxpayer seeking to amend his tax return to deduct the amount of the custom duties from the gross income in the same manner as other taxes paid, instead of including the custom duties paid in the cost of goods.

In opposition, the Government argues that the Bernsteins "elected" to take this credit and the fact that they were mistaken as to the consequence does not lessen the binding character of the election. Further, the Government attempts to discredit the Ninth Circuit's decision in *Mamula* through the Tenth Circuit Court of Appeals' decision in *Ackerman v. United States*, 318 F.2d 402 (10th Cir.1963) (failure to report realized income on installment method of accounting in the year of sale, as required by regulations, precluded entitlement of relief). Aside from the fact the Commissioner no longer follows *Ackerman, see* Technical Information Release No. 756, August 24, 1965, it also presented a situation in which the taxpayer failed to report any income at all from the sale. Thus, it is not analogous to the factual situation here.

The defendant, however, seeks to distinguish the cases upon which plaintiffs principally rely, *i.e., Mamula, Silver Queen,* and *LeBolt, supra,* by arguing that those cases, particularly *Mamula,* involved the selection of an accounting method for reporting realized income. Because realized income *must* be reported, selection of an accounting method is mandatory. Thus, if an impermissible method is selected, another *must* be substituted. Here, defendant argues, an election of an investment credit is not required. In other words, an investment tax credit is not an item which *must* be reported, rather, it is merely a credit which a party may or may not claim.

The court, however, is not convinced that the Government's distinction merits disregard of the principles announced in *Mamula, Silver Queen* and *LeBolt.* None of those opinions rested crucial concern upon whether the tax item in issue was one which was required to be reported. Rather, each opinion focused upon the fact that the taxpayer originally selected a method of reporting which was not open to him thus distinguishing those cases in which a taxpayer had two permissible choices and later sought a change. Having mistakenly selected an impermissible avenue in good faith, the plaintiffs should not be precluded from selecting the permissible method, *viz.,* passing through the investment tax credit to Maid-Rite, the lessee.

The Government views the transaction of plaintiffs as attempting to use the benefit of hindsight, thus preventing the normal adverse tax consequences resulting from claiming a clearly unallowable deduction. The court disagrees.

As noted *supra,* it is undisputed that plaintiffs acted in good faith at all times. Additionally, the cases cited by the Government are clearly distinguishable, *see infra* at 1167, in that in each case the taxpayer originally selected an allowable method and later sought to change that decision to another allowable method. *See e.g., Gimbel Brothers, Inc. v. United States,* 535 F.2d 14, 22, 210 Ct.Cl. 17 (1976) ("The fact that the party making an election misunderstands the tax consequences of the elected method and hence misapplies it also does not invalidate the election."); *Reaver v. Commissioner,* 42 T.C. 72, 79 (1964) ("Once a taxpayer elects to report a sale on some method other than the installment method, he is bound by that election."); *Rosenfield v. United States,* 156 F.Supp. 780, 782 (E.D.Pa.1957) *aff'd* 254 F.2d 940 (3d Cir.) *cert. denied* 358 U.S. 833, 79 S.Ct. 55, 3 L.Ed.2d 71 (1958) (fact that estate misunderstood the effect of the election on its tax liability does not mean that it did not make an election,) *J.E. Riley Investment Co. v. Commissioner,* 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940) ("If petitioner's view were adopted, taxpayers

with the benefit of hindsight could shift from one basis of depletion to another in light of developments subsequent to their original choice. It seems clear that Congress provided that the election must be made once and for all in the first return to avoid any such shifts.")

Although there is a "binding election" rule as set forth in the cases cited by the Government, the body of case law comprised of *Mamula, Silver Queen, supra,* as cited by the plaintiff, distinguishes the "binding election" rule. *See supra* at 1166–67. After careful review and consideration, this court concludes that the case *sub judice* falls within that line of case cited by the plaintiff. This court finds that plaintiffs cannot be held to have made a binding irrevocable election by having erroneously and in good faith claimed the investment tax credit themselves.[3] The Bernsteins' "election" to claim the investment tax credit personally was an impermissible choice and therefore, they cannot be considered to have made a binding election. As often stated, a taxpayer may not attempt to use hindsight to reap the benefit of a more advantageous tax provision. That, however, is not the case here.

### B. Abuse of Discretion

■ Ordinarily, the holding that plaintiffs' did not make a binding election would end the analysis. Under the precise set of facts presented in this case, however, this court finds that even if plaintiffs' decision to claim the tax credit personally would constitute a "binding election," the Commissioner abused his discretion in refusing to allow plaintiffs to amend their return.

As a preliminary matter to the discretion issue, the court must consider the Government's argument that Treasury Regulation section 1.48–4, a legislative regulation the Government asserts has the force and effect of law, specifically precludes an amendment by plaintiffs. This is so, the Government contends, because the Bernsteins failed "to comply strictly with the timing and manner of election prescribed by regulation [which] precludes the grant of the requested relief, since to grant the relief would allow them the benefit of hindsight." Brief in Support of Defendant's Motion for Summary Judgment, Document 19 of the Record at 16. The court does not agree.

Section 48(b)(1) of the Code provides that under certain conditions a lessor of section 38 property may elect to pass through the investment tax credit to the lessee. The express language of the statute provides that a lessor may elect to pass through the investment "at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary." 26 U.S.C. § 48(b)(1). The regulations promulgated pursuant to section 48 provide that in order for a lessor to pass through the investment credit, a statement of election must be filed with the lessee on or before the due date of the lessee's income tax return. Treas.Reg. § 1.48–4(a)(iv); (f)(2). Thus, the Government argues that the Bernsteins are foreclosed from passing through the credit because they did not file a statement to that effect on January 15, 1981, Maid-Rite's income tax return due date.

Inasmuch as the Internal Revenue Service has held that a lessor may make a *nunc pro tunc* election to pass through the investment tax credit, the Government's argument that § 1.48–4 precludes plaintiff's election is not persuasive. "[T]he Commissioner has discretionary authority pursuant to § 1.9100–1 to grant an extension of time for making the election to pass through the investment tax credit to the lessee." Revenue Ruling 79–415. It is difficult to understand how the Government can argue that strict compliance is mandatory when the Commissioner has discretion to waive any time limit. If § 1.48–4 required absolute mandatory compliance, then it would seem

---

**3.** Further, the regulation itself only holds the election be irrevocable as of the time that the lessor files the statement with the lessee. *See supra* at p. 1163.

that § 1.9100–1 would not apply to investment tax credit situations.[4]

Plaintiffs contend that the Commissioner abused his discretion in refusing to allow plaintiffs to file a *nunc pro tunc* election. Treas.Reg. § 1.9100–1 provides that the Commissioner "upon good cause shown" may exercise his discretion to grant a reasonable extension of time in which to file an election, provided: (1) the time for making the election or application is not expressly prescribed by the statute; (2) the request for the extension if filed with the Commissioner within a period of time the Commissioner considers reasonable under the circumstances; and (3) it is shown to the Commissioner's satisfaction that granting the extension will not jeopardize the Government's interests. *Id.*

Revenue Procedure 79–63 concerns application for extensions of time for making an election pursuant to Section 1.9100–1 of the regulations and sets forth some factors to consider in determining whether such extensions will be granted. The following factors generally will be taken into consideration in determining whether under the facts and circumstances of each situation, good cause for granting the extension has been shown and the other requirements of Section 1.9100–1 have been met:

(1) due diligence of the taxpayer ...

(2) prompt action by the taxpayer ...

(3) intent of the taxpayer ...

(4) prejudice to the interests of the Government ...

(5) statutory and regulatory objectives. *Id.*

Two Revenue Rulings on the issue of extension of time in which to pass-through the investment tax credit merit discussion. The Internal Revenue Service in Revenue Ruling 79–414 determined an extension of time would not be granted under Section 1.9100–1 of the regulations in order to allow the taxpayer to file an election to pass through the investment credit. The Commissioner determined that good cause for granting the extension had not been shown and the other requirements of Section 1.9100–1 had not been met. The Revenue Ruling states:

> The taxpayer-lessor and the taxpayer's accountant were aware that the leased property qualified for the investment tax credit and they acted timely to claim the credit for the taxpayer. However, section 46(e)(3) of the Code prohibits the taxpayer, as lessor, from claiming the credit for the taxpayer's taxable years 1972 and 1973. The failure to comply with this restriction was not merely due to erroneous professional advice but rather was due to a lack of due diligence in complying with the available and clear statutory and regulatory provisions.

> Under these circumstances, the taxpayer in claiming the investment credit acted inconsistently with an intent to elect to pass the credit through to the lessee. This action is prejudicial to the interests

---

**4.** Notably, in *Taylor v. Commissioner,* 67 T.C. 1071 (1977), the Tax Court held that strict compliance with a requirement that an election be filed is mandatory when six circumstances are shown to exist. These six factors have been cited with approval in *Continental Bank v. United States,* 517 F.Supp. 918, 924 (E.D.Pa.1981), *aff'd* 688 F.2d 819 (3d Cir.1982). The six circumstances include:

(1) change of position by the taxpayer concerning choice of options;
(2) failure to elect enabled the taxpayer to have the benefit of hindsight;
(3) untimely elections would prejudice the Government;
(4) the filing requirement was clearly specified in the statute or regulation;
(5) the required election related to the substance of the statutory scheme; and

(6) the untimely election could affect the taxpayer's liability for another year.
*Id.* While the Government argues all six circumstances have been met, this court has already concluded that plaintiffs here, acting in good faith, were not the beneficiaries of hindsight, playing both ends against the middle. The Government cannot maintain that plaintiffs utilized hindsight because it connotes using the advantage of reconsideration. Here, a good faith impermissible choice was made and it was not a situation involving the selection among alternatives. Further, the court discerns no prejudice to the Government. As a result, the *Taylor* factors do not support a finding of mandatory compliance.

of the Government because if the Service did not timely assert an adjustment allowing the taxpayer's claim of the credit, the taxpayer would retain the benefit of the erroneously claimed credit.

Granting an extension in this situation would also be inconsistent with the objective of the underlying statute to prohibit the use of the investment credit by individual lessors.

If relief were granted under Section 1.9100-1 of the regulations to taxpayers who have taken clearly prohibited actions, taxpayers would be encouraged to take such actions when they are to the taxpayer's advantage. Discovery and disallowance of the item on audit would not have the normal adverse tax consequences if the taxpayer were subsequently permitted to enjoy the alternative permissible action that the taxpayer could have obtained by making the election originally.

*Id.* Accordingly, the extension of time was not granted. However, as to the statement that taxpayers would be encouraged to take clearly prohibited actions when they are to the taxpayer's advantage, such "encouraged" actions would not exist here as it is conceded that plaintiffs acted in good faith.[5]

In Revenue Ruling 79-415, however, also involving an extension of time for purposes of the investment tax credit, the Service found good cause for granting the extension. In this situation, the failure of the taxpayer to timely file the election under Section 48(d) of the Code was, according to the Service, the result of an oversight by the taxpayer. In other equipment-leasing transactions, the taxpayer had always made the election at the time the lease was signed. Additionally, in those cases, by not claiming an investment tax credit on the income tax return, the taxpayer's action was still consistent with its intention to make the election. Further, the taxpayer acted promptly when informed by the lessee of the failure to make the election. Because of these factors, the Service determined that granting the extension would neither prejudice the interests of the Government nor cause undue administrative burden, nor would it be inconsistent with the objectives of the underlying statute of the regulatory election. *See Illinois Valley Paving Co. v. Commissioner*, 687 F.2d 1043, 1046 (7th Cir.1982) (citing Revenue Ruling 79-414 and Revenue Ruling 79-415).

The Bernsteins present a different issue from the taxpayers in the above Revenue Rulings. While plaintiffs did claim the tax credit for themselves, unlike the taxpayers in Rev.Rul. 79-415 who did nothing, the Bernsteins acted upon reliance of their accountant and in good faith, also unlike the taxpayer in 79-414 who was found not to have relied wholly upon the advice of a professional.

Central to this court's determination that the Commissioner abused his discretion is the Government's concession that the taxpayers here were at all times acting in good faith. Thus, this is not a taxpayer gambling on the probability that he would not be audited. *See Archbold v. United*

---

5. To some extent Revenue Ruling 79-414 has been diluted by the Supreme Court's ruling in *United States v. Boyle*, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). As the Court explained:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions if the Code himself would nullify the very

purpose of seeking the advice of a presumed expert in the first place.

*Id.* at 693 (emphasis in original). *Boyle* involved a taxpayer whose retained attorney failed to file a federal estate tax return in a timely manner. The Court ultimately determined that one does not have to be a tax expert to know that tax returns have filing dates and that it requires no special training to ascertain such deadline and make sure it is met. The Bernsteins, however, were advised by their accountant on a matter of tax law and reasonably in good faith relied upon that advice. This case, of course, does not involve a simple situation of failing to ascertain a filing deadline.

*States,* 201 F.Supp. 329, 332 (D.N.J.1962) *aff'd,* 311 F.2d 228 (3d Cir.1963).

The Government contends that the plaintiffs' actions were not reasonable nor prompt under the circumstances. This is not supported by the facts. The Bernsteins' accountant requested that plaintiffs be allowed to pass through the tax credit immediately upon learning that plaintiffs were not entitled to the tax credit themselves.[6] Plaintiffs' brief at 9. Plaintiffs shortly thereafter filed all required papers in an attempt to pass-through the credit.

In light of the Government's concession that plaintiffs acted at all times in complete good faith, it is difficult, if not impossible to rationally distinguish the Bernsteins from the taxpayer in Rev.R. 79–415 *supra.* Under the Governments theory had the Bernsteins done nothing, *i.e.,* not claimed the credit nor passed it through to Maid-Rite, an extension would have been granted. Having conceded that plaintiffs acted in good faith, this court finds little rationality in denying an extension to a good faith taxpayer who made an impermissible choice while granting an extension to a taxpayer who did nothing at all. The court finds that the Commissioner abused his discretion in failing to find that plaintiffs had established "reasonable cause." [7]

An extension here would not be inconsistent with the objective of the underlying statute and the interests of the Government would not be prejudiced if the extension were granted.[8]

### C. Motion to Strike

The Government additionally requests that plaintiffs, Donald and Elaine Bernstein, should be dismissed from this action as improper party plaintiffs. It alleges that this court lacks jurisdiction to entertain what in effect amounts to a suit for refund of taxes paid by the Bernsteins, individuals who have not filed a claim for refund thereof. Section 7422 of the Code states:

No suit or proceeding shall be maintained in any court for the recovery of any Internal Revenue tax alleged to have been erroneously or illegally collected, or of any penalty claim to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

6. The Government does not argue that plaintiffs did not act promptly when informed of their error. Rather, the Government focuses upon the fact that the application for extension of time was made in 1982, well over a year after the time for making the election had passed. Defendant's Brief at 23–23. Inasmuch as plaintiffs were unaware of their good faith error the court finds the Government's argument unpersuasive.

7. The Eighth Circuit in *Bookwalter v. Mayer,* 345 F.2d 476 (8th Cir.1965), stated that "[t]he Commissioner's action in rejecting an amendment can be overturned where the Commissioner has abused his discretion." *Id.* at 480. In *Bookwalter,* the only reason the Commissioner refused to allow an amendment to the income tax return was his view of the law that no amendment could be permitted. This, the court found to be erroneous. There was no question about the taxpayers' good faith in that case and the regulation involved was a new one about which the taxpayers had no actual knowledge. Additional-

ly, there was no unreasonable delay and no prior inconsistent position taken by the taxpayers. The situation in *Bookwalter,* therefore, is not clearly distinguishable from the instant case. Additionally, the Government conceded that any taxpayer in the Bernsteins' position notwithstanding good faith would always be denied leave to amend because of the inconsistency of their position. This, again, is to prevent the taxpayer of beneficial hindsight. It also puts into question whether the Commissioner is actually exercising discretion if such decisions are routinely made. Certainly it prevents a good faith taxpayer, like plaintiffs here, from the benefit of that discretion.

8. This court has difficulty accepting the Government's argument that allowing plaintiffs to amend would result in "opening the floodgates" inasmuch as Government counsel indicated at oral argument that there was little case law on the subject of investment tax credit because the credit was rarely disputed.

26 U.S.C. § 7422(a). *See Republic Petroleum Corp. v. United States,* 613 F.2d 518, 524 (5th Cir.1980). The Government is correct that there is no allegation by plaintiffs Donald and Elaine Bernstein that they have filed a timely claim for refund in their own behalf. The only refund action filed is on behalf of Maid-Rite. The court will allow the Bernsteins to remain in this action, however, to the extent that they are seeking to pass through the investment tax credit to Maid-Rite.

**D. Conclusion**

In conclusion, this court finds that plaintiffs were not bound by the decision to claim the tax credit because that "election" was an impermissible and nonallowable choice. Alternatively, even if the election were binding upon plaintiffs, the court finds the Commissioner abused his discretion in denying the plaintiffs their request to file *nunc pro tunc.* Because the parties agreed that the refrigeration system was § 38 property and the amount of tax credit was $139,890.00, only for the purposes of these summary judgment motions, the court will hold plaintiffs' Motion for Summary Judgment in abeyance in order to allow the parties the opportunity to present supplemental briefs and documentation on these issues.

An appropriate order will enter.